1

2

3

4

5

6

"O"

7          UNITED STATES DISTRICT COURT

8          CENTRAL DISTRICT OF CALIFORNIA

9          WESTERN DIVISION

10   RAYMOND CHARLES              )   Case No.  CV 08-00841 AHM (AN)
     RANDOLPH,                    )
11                                )
            Petitioner,           )   REPORT AND RECOMMENDATION OF
12                                )   UNITED STATES MAGISTRATE JUDGE
      v.                          )
13                                )
     S. SULLIVAN,                 )
14                                )
            Respondent.           )
15   _____)

16          This Report and Recommendation is submitted to the Honorable A. Howard

17   Matz, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-

18   07 of the United States District Court for the Central District of California. For the

19   reasons reported below, the Magistrate Judge recommends that the court deny the third

20   amended petition for writ of habeas corpus by a person in state custody ("TAP")

21   pursuant to 28 U.S.C. § 2254 and dismiss this action with prejudice.

22                              **I. BACKGROUND**

23   **A.     State Court Proceedings**

24          On May 12, 2004, petitioner Raymond Charles Randolph ("Petitioner") was

25   convicted of second degree murder (CAL. PENAL CODE § 187(a)), assault with a

26   semiautomatic firearm (CAL. PENAL CODE § 245(b)), and possession of a firearm with

27   a prior conviction (CAL. PENAL CODE § 12021.1), following a jury trial in the California

28   Superior Court for Los Angeles County (case no. MA027017). The jury also found true

allegations that, in the commission of the first two counts, Petitioner personally used and intentionally discharged a handgun, proximately causing great bodily injury and death to the victim, Ricardo King (CAL. PENAL CODE §§ 12022.5(a), 12022.53(d)). (Reporter's Transcript on Appeal ("RT") (Lodged Document ("LD") 2) at 1040-42; Clerk's Transcript ("CT") (LD 1) at 314-16.)

After a bifurcated trial, the same jury found true allegations that Petitioner had suffered two prior felony convictions for which prison sentences were imposed (CAL. PENAL CODE § 667.5(b)), and which qualified as serious felonies (CAL. PENAL CODE § 667(a)(1)), as well as serious or violent felony convictions, or "strikes," under California's Three Strikes Law (CAL. PENAL CODE §§ 1170.12(a)-(d); 667(b)-(i)). (RT at 1043, 1076-78; CT at 317-18.) On August 30, 2004, the trial court denied Petitioner's motion to dismiss a prior "strike" felony conviction pursuant to California Penal Code section 1385 and *People v. Superior Court (Romero)*, 13 Cal. 4th 497, 504, 53 Cal. Rptr. 2d 789 (1996), and sentenced Petitioner to a total indeterminate term of 80 years to life in state prison. (RT at 1131, 1133-34, 1137-39; CT at 466-67, 469-70.)

Petitioner appealed the judgment of conviction to the California Court of Appeal, Second Appellate District, Division Two, raising, *inter alia*, four of the nine claims in his pending TAP. (LD B.) In an unpublished opinion (case no. B177777), the court of appeal rejected these claims and affirmed the judgment. (LD E.) The state high court denied review without comment (case no. S139870). (LD F&G; TAP at 78.[1])

Petitioner filed at least four habeas petitions in the state courts, all of which were denied. (TAP at 79-83; LD H-M.) Among those he raised grounds five, six, eight and nine in a state habeas petition filed in the California Supreme Court (case no. S162357). That petition was denied with citations to *In re Clark*, 5 Cal.4th 750, 21 Cal. Rptr. 2d

---

[1] The TAP, including attachments and exhibits, is 83 pages in length, but is not consecutively numbered as required by Local Rule 11-3.3. For convenience and clarity, the court cites to the pages of the TAP by referring to the pagination furnished by the court's official CM-ECF electronic document filing system.

509 (1993), and *In re Miller*, 17 Cal. 2d 734 (1941). (LD L&M; TAP at 83.) As discussed more fully below, Petitioner did not raise ground seven (prosecutorial misconduct) in any state court.

**B.     Pending Proceedings**

On February 7, 2008, Petitioner commenced this action by filing his original petition but the court granted him leave to amend because he failed to set forth his claims in accordance with the court-approved form. (Pet., dkt. 1; 2/21/08 Order (AN), dkt. 4.) On March 6, 2008, Petitioner filed a first amended petition ("FAP") raising eight claims. (FAP, dkt. 5.) The court found the FAP was subject to dismissal as a mixed petition because three of the eight claims plainly appeared to be unexhausted. However, the court gave Petitioner leave to cure the defect by filing a second amended petition ("SAP") raising only exhausted claims. (3/17/08 Order (AN), dkt. 8.) On March 27, 2008, Petitioner filed his SAP, again containing eight claims. (SAP, dkt. 12.)

On May 13, 2008, Respondent moved to dismiss the SAP on the ground Petitioner still had a habeas petition pending in the state courts. (Motion to Dismiss ("MTD"), dkt. 20.) Based on the documents lodged with the MTD, the court determined that Petitioner had made misrepresentations in the SAP and that it was also a mixed petition. The court then gave Petitioner one final chance to correct the deficiencies in the SAP. (5/16/08 Order (AN), dkt. 22.)

Petitioner subsequently filed the pending TAP, which raises nine claims. (TAP at 5-6, 9-14.) The court denied the MTD as moot and ordered a response to the TAP. (10/20/08 Order (AN), dkt. 26.) Respondent then filed an Answer arguing that grounds one and three are procedurally barred and all nine claims lack merit. (Answer at 9-33.) Petitioner has filed a Reply (dkt. 31) and the matter now stands submitted.

///

///

///

///

**II. DISCUSSION**

**A.     Standard of Review**

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, a federal court may not grant a state prisoner's application for habeas relief for any claim adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[;]" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *see Rice v. Collins*, 546 U.S. 333, 334, 126 S. Ct. 969 (2006); *Williams v. Taylor*, 529 U.S. 362, 405-09, 120 S. Ct. 1495 (2000); *Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (*en banc*). Recently, the United States Supreme Court unanimously reaffirmed the principle that the AEDPA is limited to:

> preserv[ing] authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Harrington v. Richter*, 562 U.S. ---, 131 S. Ct. 770, 786 (2011) (citation omitted).

"Clearly established Federal law" refers to the governing legal principle or principles established by the Supreme Court's holdings, not dicta, at the time the state court renders its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166 (2003); *Carey v. Musladin*, 549 U.S. 70, 74, 127 S. Ct. 649 (2006). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008) (*en banc*). Where no decision of the United States Supreme Court "squarely addresses" an issue or provides a "categorical answer" to the question before the state court, § 2254 (d)(1) bars relief because the state

1  court's adjudication of the issue cannot be contrary to, or an unreasonable application

2  of, governing Supreme Court law. *Wright v. Van Patten*, 552 U.S. 120, 123-26, 128 S.

3  Ct. 743 (2008); *Moses v. Payne*, 555 F.3d 742, 753 (9th Cir. 2009).

4      A state court decision is "contrary to" governing Supreme Court law if it: (1)

5  applies a rule that contradicts the governing Supreme Court law; or (2) "confronts a set

6  of facts . . . materially indistinguishable from a decision of [the Supreme Court] but

7  reaches a different result." *See Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432

8  (2005); *Williams*, 529 U.S. at 405-06. The Supreme Court has emphasized that citation

9  of its cases is not required so long as "neither the reasoning nor the result of the state-

10  court decision contradicts [its governing decisions]." *Early v. Packer*, 537 U.S. 3, 8, 123

11  S. Ct. 362 (2002); *see also Bell v. Cone*, 543 U.S. 447, 455, 125 S. Ct. 847 (2005).

12  What matters is whether the last reasoned *decision* reached by the state court was

13  contrary to Supreme Court law, not the intricacies of the analysis. *Hernandez v. Small*,

14  282 F.3d 1132, 1140 (9th Cir. 2002); *see also Richter*, 131 S. Ct. at 784-85.

15      A state court decision involves an "unreasonable application" of governing

16  Supreme Court law if the state court: (1) identifies the correct governing Supreme Court

17  law but unreasonably applies the law to the facts; or (2) unreasonably extends a legal

18  principle from governing Supreme Court law to a new context where it should not

19  apply, or unreasonably refuses to extend that principle to a new context where it should

20  apply. *Williams*, 529 U.S. at 407. Further, unreasonable application requires the state

21  court decision to be "objectively unreasonable, not just incorrect or erroneous."

22  *Andrade*, 538 U.S. at 65; *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527

23  (2003). More specifically, to establish an "unreasonable application" of clearly

24  established Supreme Court precedent, "a state prisoner must show that the state court's

25  ruling on the claim being presented in federal court was so lacking in justification that

26  there was an error well understood and comprehended in existing law beyond any

27  possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

28  ///

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029 (2003) ("*Miller-El I*") (citing 28 U.S.C. § 2254(e)(1)); *see e.g.*, *Moses*, 555 F.3d at 745 n.1.

With the exception of grounds four and seven, AEDPA's deferential standard applies to the other claims raised in the pending TAP. Grounds one through three were presented to both levels of the state appellate courts. The court of appeal rejected these claims in a reasoned opinion, and the state high court denied them without comment. (TAP at 78; LD E&G.) Although the state high court denied Petitioner's first three claims without comment, that court's silent denial still constitutes a denial on the merits for purposes of federal habeas review. *Richter*, 131 S. Ct. at 784-85. Grounds one through three are also deemed to have been rejected for the same reasons given in the last reasoned decision, which in this case was the court of appeal's November 15, 2005 opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802-06, 111 S. Ct. 2590 (1991).

Grounds five, six, eight and nine of the TAP were rejected by the California Supreme Court on state habeas review. (LD L&M.) Since the state courts provided no reasoned decision in denying those four claims, Petitioner is only entitled to relief if he meets his burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.[2]

Ground four was denied by the court of appeal on direct review but it was never presented to the state high court on direct or collateral review. Ground seven was not presented to any state court. As discussed more fully below, the court will conduct a de novo review of the merits of these claims since neither of them raise a colorable federal claim.

///

---

[2] The superior court's minute order denying habeas relief refers to an attached "4 page memorandum" decision, but to the extent such a decision exists, it was not included in the instant record. (TAP at 79.)

**B.**   **Facts Established at Trial**

The court of appeal's decision affirming Petitioner's judgment of conviction contains factual determinations drawn from the record. These factual determinations are presumed correct where, as here, Petitioner has not proffered clear and convincing evidence to the contrary. § 2254(e)(1); *Miller-El I*, 537 U.S. at 340. Further, although Petitioner has not raised an insufficient evidence claim, the court has nevertheless conducted an independent review of the record and finds the summary of relevant facts in the court of appeal's decision is based upon a reasonable determination of the trial evidence. Therefore, this court adopts verbatim the court of appeal's following summary of the relevant facts:

I. Prosecution Evidence

In the afternoon of September 1, 2002, Ricardo King was fatally shot in front of his home in Palmdale. Earlier that day, shortly before 9:00 a.m., appellant approached King's front door while an individual named Juan Gillespie was knocking on King's door. Appellant and Gillespie began exchanging words about items that their children had borrowed from one another. Appellant "sucker-punched" Gillespie. King went to his door and told the two men to get off his porch and take their dispute elsewhere.

Later that morning, Foster Lott was standing on his girlfriend's balcony when he saw two people in a shoving match in the front yard of King's home. One man was holding a stick and using it to push the other man out of the yard. The encounter lasted three or four minutes.

That afternoon, King went shopping to get items for a barbecue. When he returned home, his daughter went inside and told King's wife, Amanda, that he had arrived. Amanda went to the front door and saw King still inside his Jeep. She saw appellant pull up beside King in a car. Appellant asked King if he wanted to talk to appellant. King said he did

not. King got out of his Jeep and walked to its passenger side. Appellant said he would shoot King. Appellant then asked King why he was going to the passenger side of the car, and King said he was getting his groceries. Appellant again told King he was going to shoot him. King replied, "I know you will." King walked toward the house carrying grocery bags, and appellant got out of his car and pulled a handgun from under his T-shirt. Appellant shot King two times from a distance of approximately six feet. He shot twice more and got in his car and drove away. King looked at Amanda and fell to the ground. Amanda identified appellant in court as the shooter.

Kimela Franklin, a visitor to the King home, also witnessed the shooting. She saw King holding grocery bags while a man stood holding a gun on King. Franklin remembered the man saying, "I'll fucking shoot you." King replied, "Man, whatever," or something similar and ignored the man with the gun. King turned his back and began to walk away. When the man shot at King, Franklin thought he was trying to make King "dance," because the shots hit the ground. Franklin saw King crouch behind the Jeep and then fall backwards. Franklin did not see King open the hatch of the Jeep, nor did she see a struggle between King and the shooter.

Franklin administered CPR on King and was able to resuscitate him momentarily. King told Amanda, "Take care of my kids." Franklin saw a gunshot wound with very little bleeding on the right side of King's nipple.

Christopher N., who was 11 years old at the time of appellant's trial, testified that he was playing on the street with friends when he heard "popping noises." He ran to the shooting scene and saw a man lying on the ground with grocery bags in his hands.

Dora G., who was 16 years old at the time of the shooting, was

looking through a living room window when she saw a blue car pull up beside King, who lived across the street from her. She saw that King was holding grocery bags. The man in the blue car got out of his car, and the two men appeared to be talking. They were not close together -- not even approaching arm's length from one another. Dora G. saw the person who arrived in the car shoot King more than once. She saw King collapse and fall on his back. Dora G. saw no struggle between the two men before the shooting. She saw the shooter get in his car and drive away.

Dr. Paul Gliniecki of the Los Angeles County Department of Coroner performed an autopsy on King. Dr. Gliniecki was of the opinion that the cause of death was a gunshot wound to the back that exited on the front of King's chest.

Detective Randy Seymour was one of two investigating officers in the case. On September 11, 2002, Seymour interviewed appellant in Las Vegas at the Clark County Detention Center along with Lieutenant Ted Lee of the Las Vegas Metropolitan Police Department. Seymour took notes but did not record the interview at appellant's request. Appellant told Seymour of his encounter with Juan Gillespie at King's house when appellant went there to buy marijuana. Appellant called King "Ice." Appellant said he later went back to King's house because he did not "want to lose favor with" King, since King was his marijuana supplier. Appellant believed he had made peace with King, and King told him to go to the rear yard to buy the marijuana. When appellant said he was not mad at King, King "snapped" and began ordering him off the property. Appellant apologized, but King got a large piece of wood from the back of his Jeep and ordered appellant to leave, swinging the wood at appellant's head. Appellant returned to his car, where his girlfriend and children were waiting, and drove away. Appellant said he sustained a cut

on his arm from blocking the piece of wood.

Appellant said he was angry and his pride was hurt because the incident occurred in front of his family. He dropped off his family and went to look for some friends. He bought a half pint of tequila and drank half of it. He found a friend named Ronnie and the two "ended up" at the King home. Appellant would not help Seymour identify or find Ronnie.

Appellant saw King getting out of his Jeep. He said that "when he saw him, that coupled with the tequila in his system, he was ready to fight." He got out of his car with the intention to fight and told King it was just King and him now. Appellant said that King opened the hatchback of the Jeep and reached in. Because of the earlier incident, appellant believed King was arming himself with a two-by-four. Appellant also reached into the back of the Jeep to grab the two-by-four, but he saw that King was reaching for a gun. Appellant grabbed the black nine-millimeter handgun, and appellant and King began struggling for the gun. Appellant managed to regain control of the gun, and King then charged at him. Appellant fired into the ground and saw that King walked to the sidewalk and fell over. Appellant dropped the gun, got back in his car, and drove away. Appellant learned the following morning that King had been killed, and appellant fled because he feared King's friends. Lieutenant Lee's testimony regarding appellant's statements was consistent with that of Detective Seymour.

II. Defense Evidence

Deputy Thomas Whalen of the Los Angeles County Sheriff's Department responded to a domestic violence call at the King home on November 18, 2000. Amanda told Whalen that she and King had argued because King was demanding money from her. King struck Amanda with his fists, and one blow hit her head. Amanda locked herself in the

bathroom, but King knocked the bathroom door from its hinges and continued to assault Amanda. King struck another female in the home who tried to intervene. Amanda suffered a cut above her ear and the other woman had a "knot" at her hairline where King struck her. King took two cell phones from the home, forcing Amanda to call police from a pay telephone. King was later arrested.

Alicia Flores was a neighbor of King's. She testified that there was always someone sitting on King's porch, usually men. Flores never became acquainted with King because she saw a lot of activity at King's house and she feared it involved drugs. She saw people arrive, stay a few minutes, and then leave.

(LD E at 3-6.)

## C. Instructional Error Claims (Grounds One Through Four)

Petitioner first contends four instructional errors, each described below, violated his right to due process, to present a complete defense, and to have a jury decide all material issues of fact. (TAP at 5-6, 41-56, 58-65, 67-70, 72-74; Reply at 4-6.)

Generally, claims of error in state court jury instructions are a matter of state law and do not invoke a constitutional question. *Hayes v. Woodford*, 301 F.3d 1054, 1086 n.38 (9th Cir. 2002). The fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-73, 112 S. Ct. 475 (1991). Thus, to obtain relief based on a charge to the jury, a petitioner must establish not merely that the instruction was undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the petitioner by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396 (1973). That is, the central inquiry is whether the instruction in question so infected the entire trial that the resulting conviction violates due process. *Id.* at 147.

As with a claim that a trial court erred in *giving* a particular instruction, a claim that a court erred in *omitting* an instruction requires a showing that the error so infected

the entire trial that the resulting conviction violated due process. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730 (1977). However, in such cases, the petitioner's burden is especially heavy, as an omission is less likely to be prejudicial than an affirmative misstatement of the law. *Id*. at 155. Failure to give a jury instruction which might be proper as a matter of state law does not, by itself, merit federal habeas relief. *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985). Further, "[t]he necessity, extent and character of additional instructions are matters within the sound discretion of the trial court." *Wilson v. United States*, 422 F.2d 1303, 1304 (9th Cir. 1970).

Based on the foregoing, all of Petitioner's instructional error claims fail. The court addresses each of them below.

### 1.   Procedural Default

Preliminarily, Respondent argues ground one is procedurally defaulted based on Petitioner's failure to raise his constitutional challenge in the trial court, and that ground three is procedurally defaulted based on Petitioner's failure to request the omitted instruction at trial. (Answer at 11-13, 18.)

The procedural default doctrine bars review of a petitioner's federal habeas claim when the claim was rejected in state court based on an adequate and independent state procedural bar. *Coleman v. Thompson*, 501 U.S. 722, 729-30, 111 S. Ct. 2546 (1991). To be independent, such a procedural bar must have arisen from explicit and independent state law. *Id*. at 735; *Harris v. Reed*, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989). If the basis of the decision is interwoven with federal law, or if a threshold federal analysis is required, there is no independent basis for the procedural bar, and the petitioner may seek relief in federal court. *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003). For the procedural bar to be adequate, it must be clear, consistently applied, and well established at the time of the alleged default. *Collier v. Bayer*, 408 F.3d 1279, 1284 (9th Cir. 2005).

Respondent has the initial burden to adequately plead "the existence of an independent and adequate state procedural ground as an affirmative defense. . . ."

*Bennett*, 322 F.3d at 586. That burden is satisfied when the state raises the defense explicitly and clearly. *See King v. LaMarque*, 464 F.3d 963, 967 (9th Cir. 2006) (respondent's initial burden met where "[t]he government explicitly pleaded 'the existence of an independent and adequate state procedural ground . . . .'"); *see also Grayson v. Carey,* 291 Fed. Appx. 17, 19 (9th Cir. 2008)[3/] (implying the initial burden on the state is merely to "clearly raise[] a procedural bar defense" in its responsive pleading). Here, while Respondent expressly raises procedural default as an affirmative defense to both grounds one and three in the Answer, Respondent has failed to articulate independent and adequate state procedural grounds.

Specifically, the record does not establish the state court of appeal actually *relied on* a state procedural bar in denying grounds one and three on direct appeal. The doctrine of procedural default does not bar consideration of a federal claim unless the state court "clearly and expressly" states that its judgment rests on a state procedural bar. *Harris*, 489 U.S. at 263. After a thorough denial of ground one on the merits, the court of appeal merely referred to the possibility of waiver: "Assuming appellant did not forfeit his constitutional claims by failing to raise them below, we conclude that these contentions must also be rejected." (LD E at 8.) Similarly, in ground three, after a denial on the merits, the court of appeal again made only a perfunctory, tangential reference to waiver: "Assuming appellant preserved any federal constitutional issue, we would find the error harmless." (LD E at 11.) In light of the fact the court of appeal merely speculated these claims might have been waived after denying both on the merits, this court finds the state court of appeal did not "clearly and expressly" rely on waiver as a ground for rejecting either ground one or three. *See Harris*, 489 U.S. at 266 (state appellate court did not "clearly and expressly" rely on waiver where it merely pointed out the federal claims "could have been raised [on] direct appeal," but then rejected them on the merits); *see also U.S. ex rel. Bell v. Pierson*, 267 F.3d 544, 556

---

[3/] *Grayson* is cited for its persuasive value pursuant to Fed. R. App. P. 32-1(a) and Ninth Circuit Rule 36-3.

1    (7th Cir. 2001) (no procedural default where state court's decision mentioned state

2    waiver rule but then proceeded to discuss the merits instead of applying it to the facts

3    of the case).

4         Lending further support to this court's conclusion, the state court of appeal did

5    not articulate any specific procedural rule, but instead cited *People v. Williams*, 16 Cal.

6    4th 153, 250, 66 Cal. Rptr. 2d 123 (1997), a case that refers to section 353 of

7    California's Evidence Code, also known as the "contemporaneous objection rule." (LD

8    E at 8, 11.) The contemporaneous objection rule is a state <u>evidentiary</u> rule providing

9    that evidence is admissible unless there is an objection, the grounds for the objection

10   are clearly expressed, and the objection is made at the time the evidence is introduced.

11   *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002); *see also Williams*, 16 Cal. 4th

12   at 250 (applying the rule to the admission of gang paraphernalia). It is reasonable to

13   conclude the state court did not intend to rely on an evidentiary rule to bar Petitioner's

14   instructional error claims.

15        Based on the foregoing, Respondent has not met the initial pleading requirement.

16   *King*, 464 F.3d at 967. Grounds one and three are not barred by the doctrine of

17   procedural default.

18        Regardless, the procedural default doctrine is not jurisdictional but, rather, is

19   based on comity. *Batchelor v. Cupp*, 693 F.2d 859, 863 n.2 (9th Cir. 1982). Thus,

20   federal courts have the power to reach the merits notwithstanding a state procedural

21   default. *Id*. Where it is clear that a claim fails on the merits, the interests of comity and

22   judicial efficiency are better served by addressing the claim on the merits rather than

23   invoking procedural default. *Walters v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995).

24   Because grounds one and three are clearly without merit, this court will proceed to

25   address the claims on the merits.

26        **2.    Failure to Give Instruction on Intoxication (Ground One)**

27        Petitioner's first claim of instructional error faults the trial court's refusal to give

28   CALJIC No. 4.21, which would have instructed the jury they should consider evidence

of voluntary intoxication in deciding whether Petitioner had the required intent to commit second degree murder, and that if the evidence left them with a reasonable doubt about whether he formed the requisite intent, they must find he did not have it. (TAP at 5, 41-56; Reply at 4); *see also* CALJIC No. 4.21. The state court of appeal denied this claim based on the following findings of fact and conclusions of law:

> The record shows appellant told Detective Seymour that, after the stick-wielding incident, appellant drove his family home and went looking for friends. On the way he obtained a half-pint of tequila and drank half of it. He then picked up the individual named Ronnie and "ended up" at King's house. Lieutenant Ted Lee, while recounting appellant's statements, stated, "He said he then left the residence and went and picked a subject up, who he identified as Ronnie. They began drinking tequila. He said that he was driving around and was still agitated over it [the stick incident]. He suddenly ended up at Ice's house again and that he was mad." During cross-examination of Lieutenant Lee, defense counsel asked, "Did you also testify that he indicated that he had drunk some tequila?" Lee replied, "Yes."
>
> The trial court removed the intoxication instructions from consideration, stating, "[w]e have no evidence other than the fact that in his statement to the detective he speaks about drinking tequilla [sic]. We don't know how much. We don't know over what period of time. We don't know what level of intoxication. Case law says that with just a vague reference to have been drinking, there is insufficient basis for the court to instruct on intoxication."
>
> * * * * *
>
> Although the evidence showed appellant had been drinking, appellant presented no evidence that his drinking of four ounces of tequila had an effect on his entertaining the specific intent to kill. There was no

evidence that appellant was intoxicated at the time of this offense, nor was there any evidence of the effect of any intoxication on his mental state at the time of the offense. It is true that appellant told Seymour the mere sight of King, coupled with the tequila in his system, made him ready to fight. Appellant mischaracterizes this statement, however, when he asserts he drank until he was ready to fight. Absent any evidence that the small amount of tequila appellant drank prevented him from forming the required specific intent, he was not entitled to the requested instructions.

(LD E at 7-8; *see also* RT at 435-37, 448, 625-27, 945-46.)

The state court of appeal's conclusion was consistent with clearly established Supreme Court precedent and based on a reasonable determination of the facts in the record. Put simply, a voluntary intoxication instruction would not have changed the verdict. *Henderson*, 431 U.S. at 154; *see also Brecht v. Abrahamson*, 507 U.S. 619, 623, 637, 113 S. Ct. 1710 (1993) (a federal habeas petitioner is entitled to relief only if an alleged error had a "substantial and injurious effect or influence in determining the jury's verdict," and only if he can establish actual prejudice). Petitioner's contentions, based solely on his own self-serving statements to the police that he consumed four ounces of tequila before driving to King's residence, are without merit. First, Petitioner's statements did not establish he was actually intoxicated when he committed his crimes. (RT at 435-37, 448, 625-27, 945-46.) Second, he merely claims any intoxication may have altered his emotional state or helped to increase his willingness to drive to King's house and confront him (TAP at 45-46; Reply at 4). But even if that were true, it does not support the conclusion that voluntary intoxication negated his *intent to kill*. There was still no evidence to show he was unable to form the intent to shoot King in the back when he did, or that he was so drunk he did not perceive that shooting a person in the back was deadly. *See* CAL. PENAL CODE §§ 187(a), 188-89; *People v. Blakeley*, 23 Cal. 4th 82, 87, 96 Cal. Rptr. 2d 451 (2000) (the "malice aforethought" required for second degree murder may be implied when the killing

results from an intentional act, the natural consequences of which are dangerous to life, and the act is deliberately committed with knowledge of those consequences and a disregard for human life); (CT at 147-48, 157.)

Third, the evidence overwhelmingly established Petitioner's guilt, including his intent. Four witnesses observed and/or heard the shooting in this case. The closest two of those witnesses saw Petitioner shoot the victim, Ricardo King, in the back as King was walking away with groceries in his hand in front of his own residence. Those witnesses specifically observed Petitioner threaten to shoot King, and then watched as he did do so at least twice from approximately five to ten feet away. (RT at 44-52, 110-18, 203-06, 259-65, 278.) Notably, none of the eyewitnesses described Petitioner as appearing intoxicated, let alone so intoxicated he was unable to appreciate his actions or their consequences. *Blakeley*, 23 Cal. 4th at 87. Petitioner has not established a voluntary intoxication instruction was necessary to prevent a federal due process violation. *Henderson*, 431 U.S. at 154.

Additionally, Petitioner's argument in ground one is principally taken from his appellate counsel's opening brief on direct appeal. (TAP at 41-56.) To the extent the arguments contained in that brief are primarily based on state law and California's harmless error standard (TAP at 41-48, 52-53), ground one is not cognizable on federal habeas review. *McGuire*, 502 U.S. at 67-68 ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Petitioner is not entitled to federal habeas relief in ground one.

### 3.     CALJIC No. 5.55 (Ground Two)

Petitioner next complains the trial court limited his right to present a complete defense by instructing the jury with CALJIC No. 5.55. Specifically, he argues because CALJIC No. 5.55 instructs jurors that "[t]he right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense," it erroneously negated his entire self-defense theory because it is clear he was the one who initiated the quarrel. Because his conduct before the

shooting ostensibly did not rise to the level of a quarrel that would cause him to forfeit his right to self-defense, he argues this instruction was overly broad and erroneous. (TAP at 5, 58-65; Reply at 5; *see also* CT at 144.)

On direct appeal, the state court of appeal found that giving CALJIC No. 5.55 was harmless error under state law, reasoning that:

> [w]e cannot agree that the mere fact of giving CALJIC No. 5.55 confused the jury or caused it to believe that it could find facts unsupported by the evidence. CALJIC No. 5.55 does not mandate a finding that the accused contrived a defense. The jury presumably disregarded a legally correct but irrelevant instruction, and there is no reasonable probability the verdict would have been more favorable had this instruction been omitted. (Citation omitted.)

(LD E at 9.)

The state court of appeal's conclusion was consistent with clearly established Supreme Court law. Petitioner's contention ignores the plain language of CALJIC No. 5.55, which only penalizes a defendant who asserts a *contrived* self-defense, i.e., where the evidence shows the defendant sought a quarrel with the intent to create a reason to act in self-defense. *See People v. Crandell*, 46 Cal. 3d 833, 872, 251 Cal. Rptr. 227 (1988), *abrogated on another ground by People v. Crayton*, 28 Cal. 4th 346, 364-65, 121 Cal. Rptr. 2d 580 (2002). Jurors are presumed to follow the court's instructions, *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727 (2000), and Petitioner has proffered nothing from the record to show that the jury failed to follow the plain language of CALJIC No. 5.55 in this case. For the same reasons, he has not shown this instructional language was overbroad, ambiguous or misleading such that the jury would have applied it incorrectly in a way that infected the entire trial. *See McGuire*, 502 U.S. at 72 (federal habeas relief may not be granted unless "there is a reasonable likelihood that the jury has applied [an allegedly ambiguous jury instruction] in a way that violates the Constitution.") (Internal quotations omitted.)

18

Further, as in ground one, to the extent Petitioner primarily cites to his opening brief on direct appeal (TAP at 58-65), and to the extent that brief argued under state law that the evidence did not support giving CALJIC No. 5.55 (TAP at 58-60), ground two is not cognizable here. *McGuire*, 502 U.S. at 67-68. And regardless, even if Petitioner could show CALJIC No. 5.55 was given in error under state law, he has failed to show this instruction, which was intended to address a very limited scenario, negated his theory of self-defense or otherwise infected the entire trial such that his resulting conviction violated due process. *Cupp*, 414 U.S. at 147; *see also Crandell*, 46 Cal. 3d at 872-73 (state case holding that even where CALJIC 5.55 was given in error, "the jury was not sidetracked by the correct but irrelevant instruction . . . .").

Petitioner is not entitled to federal habeas relief in ground two.

**4.      Failure to Instruct on Victim's Character (Ground Three)**

Next, Petitioner contends the trial court committed constitutional error by failing to give the jury a pinpoint instruction that tied a prior domestic violence incident of King's to Petitioner's theory of self-defense. More specifically, he argues the jury should have received an instruction explaining that King's prior assaultive behavior made him the likely aggressor in the confrontation with Petitioner. (TAP at 6, 67-70; Reply at 5.) The state court of appeal denied this claim in pertinent part as follows:

> [T]here was no evidence in support of reading such an instruction. Even appellant's self-serving statement to Detective Seymour contained no indication that King acted violently toward appellant immediately prior to the shooting. Appellant said it was he who uttered the first challenging words and that King then reached into his Jeep. Appellant claimed he then saw that King was extracting a gun from the car. There was no evidence King "charged" appellant, as the opening brief claims.
>
> In addition, the jury was instructed to take into consideration King's previous violence toward appellant in CALJIC No. 5.51, which informed the jury that, "Evidence has been presented that on a prior occasion the

alleged victim assaulted the defendant. If you find that this evidence is true, you may consider that evidence on the issues of whether the defendant actually and reasonably believed his life or physical safety was endangered at the time of the commission of the alleged crime. [¶] In addition, a person[] whose life or safety has been previously assaulted by another is justified in acting more quickly and taking harsher measures from [sic] self protection from an assault by that person, than would a person who had not received threats from or previously been assaulted by the same person."

Finally, defense counsel fully argued the theory contained in appellant's suggested instruction. Counsel stated, "Ricardo King sold drugs and he had a domestic violence incident with Amanda and the other woman and Deputy Whalen saw and heard about punches and cell phones taken out of the house. We know that. What do we take from that? [¶] One thing we can take from that is Ricardo King could be violent. He wanted $15. Amanda had nothing else to give him so he attacked. He knocked down the door. We know the man can be violent." And later, "If we are going to try to balance this case and determine who had the gun, the man who sales [sic] the drugs who has people coming to his home at all hours of the day and night, he's got the reason to have protection in case he is threatened. Someone tries to steal from him. We also know he is a violent man."

We conclude that any error in failing to give a sua sponte instruction on King's assaultive character was harmless, and it is not reasonably probable appellant would have received a more favorable verdict had the instruction been given. (Citation omitted.)

(LD E at 10-11.)

Again, the conclusion of the state court of appeal was consistent with clearly

established Supreme Court law, and was based on a reasonable determination of the facts in the record. For the precise reasons discussed by the state court of appeal, Petitioner has again failed to show the omission he alleges infected the entire trial and violated due process. *Henderson*, 431 U.S. at 154. The jury was thoroughly instructed in accordance with Petitioner's theory of self-defense, and instructed to consider King's prior violence as relevant to whether Petitioner acted with a reasonable belief that he was in danger. (CT at 262-73, 297.)

Moreover, it was reasonable for the jury to reject Petitioner's theory of self-defense in this case based on the trial evidence, regardless of how the jury evaluated evidence of King's prior domestic violence. Eyewitness testimony, as well as the coroner's testimony, established Petitioner shot King in the back as King attempted to walk away from Petitioner while his hands were full with grocery bags. (RT at 47-50, 114-16, 206, 262, 302-04.) Further, none of the eyewitnesses testified about seeing any physical struggle between Petitioner and King. In fact, all three of the witnesses who saw the entire incident testified that no physical struggle occurred, and one of them specifically testified Petitioner and King were never standing close enough to each other for any physical fight or confrontation to occur. (RT at 100-01, 119-20, 263-64.) Petitioner has failed to show a further instruction about King's prior assaultive behavior would have had any effect on the verdict. *Brecht*, 507 U.S. at 637.

Petitioner is not entitled to habeas relief in ground three.

### 5.    Failure to Instruct on Every Element to Prove Priors (Ground Four)

In his fourth and final instructional error claim, Petitioner refers to the bifurcated trial on his prior convictions and contends the trial court committed constitutional error by failing to instruct on the elements specific to the prior prison term allegations (CAL. PENAL CODE § 667.5(b)). More specifically, Petitioner asserts there are three elements necessary to prove the prior prison term allegation: the defendant was imprisoned pursuant to a felony conviction, the defendant completed the prison term, and there was not a lapse of five years or more between the completion of the prison term and the

commission of a new felony offense. *See People v. Tenner*, 6 Cal. 4th 559, 563, 24 Cal. Rptr. 2d 840 (1993). Petitioner claims the jury instruction intended to set forth those elements (CALJIC No. 17.18.1) was omitted, and the only instruction the jury received on the priors was CALJIC No. 17.26, which does not convey any of the three prior prison term elements. (TAP at 6, 72-74; Reply at 6; *see* RT at 1074-76.)

At the outset, this court observes and finds the full record discloses ground four is not exhausted because, while Petitioner presented it to the state court of appeal on direct review, he never presented it to the California Supreme Court on direct or collateral review. (*See* LD F, J, L); *see also Davis v. Silva*, 511 F.3d 1005, 1008 (9th Cir. 2008) (exhaustion requires that a petitioner fairly present his federal claims to the highest state court available); *Carter v. Giurbino*, 385 F.3d 1194, 1196 (9th Cir. 2004) ("Before seeking federal habeas relief, a state prisoner must fairly present all of his claims to the highest state court to provide that court with an opportunity to rule on the merits of the federal claims."). Nevertheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2). It is appropriate to do so in those cases in which the interests of comity and federalism will be better served. *Granberry v. Greer*, 481 U.S. 129, 134-35, 107 S. Ct. 1671 (1987). The court finds this is such a case because ground four "does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005). Thus, the court will proceed to address the merits.

The state court of appeal denied ground four in pertinent part as follows:

The record shows that the trial court instructed the jury with CALJIC No. 17.26, which charged the jury with determining the truth of the prior felony convictions, but it did not read CALJIC No. 17.18.1, which details the elements of a prior-prison-term allegation. Contrary to appellant's assertion, no federal constitutional violation resulted from the trial court's failure to read CALJIC No. 17.18.1.

1   . . . *Apprendi* held that the fact of a prior conviction need not be

2   submitted to the jury and proved beyond a reasonable doubt in order to

3   increase a defendant's penalty. (Citations omitted.) And, although a trial

4   court is obliged to instruct even without a request on the general principles

5   of law relating to the issues presented by the evidence (citations omitted),

6   a failure to do so is subject to harmless-error analysis. (Citation omitted.)

7   . . . In the instant case, the trial court did not impose any sentence

8   enhancements based on section 667.5 . . . Therefore, any error was

9   harmless.

10  (LD E at 15.)

11  Again, the conclusion of the state court of appeal was consistent with clearly

12  established Supreme Court law. First, as a general matter, Petitioner did not have a

13  federal constitutional right to a jury trial on the truth of the prior conviction allegations.

14  In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348 (2000), the Supreme

15  Court held that the fact of a prior conviction was an exception to the rule that "any fact

16  that increases the penalty for a crime beyond the prescribed statutory maximum must

17  be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court has

18  reaffirmed the prior conviction exception in subsequent cases. *See Cunningham v.*

19  *California*, 549 U.S. 270, 288-89, 127 S. Ct. 856 (2007); *Blakely v. Washington*, 542

20  U.S. 296, 301, 124 S. Ct. 2531 (2004). Further, to the extent Petitioner contends the

21  prior prison term allegations fall outside the scope of the prior conviction exception, the

22  Supreme Court has not determined the "precise contours" of that exception, so there is

23  still no clearly established federal law entitling Petitioner to a jury determination.

24  *Kessee v. Mendoza-Powers*, 574 F.3d 675, 677 (9th Cir. 2009). Although the Ninth

25  Circuit has construed the "prior conviction" exception narrowly, *see Butler v. Curry*,

26  528 F.3d 624, 644-46 (9th Cir. 2008), Ninth Circuit law does not constitute clearly

27  established federal law for purposes of the AEDPA. *See Kessee*, 574 F.3d at 677-79.

28  Moreover, even under Ninth Circuit precedent, a defendant is not entitled to have a jury

decide "historical, judicially noticeable facts" that are "apparent on the face of conviction documents" and do not "require a jury's evaluation of witnesses and other evidence." *See Wilson v. Knowles*, --- F.3d ----, No. 07-17318, 2011 WL 383961, at *2 (9th Cir. Feb. 8, 2011); *Butler*, 528 F.3d at 644. Here, Petitioner's two prior prison terms were conclusively established by official documents. (CT at 319-46.) They were essentially judicially noticeable facts that were apparent on the face of Petitioner's conviction documents. Petitioner has not demonstrated that he had the right to have a jury make the determination of his prior prison terms. *Apprendi*, 530 U.S. at 490.

Regardless, even if Petitioner had the right to a jury in this instance, and jury instructions as a result, he again fails to show the omission he alleges infected the entire trial and violated due process. *Henderson*, 431 U.S. at 154. Here, while there was not a specific instruction setting forth the three elements for a true finding under § 667.5(b), the jury's verdict form did just that. (RT at 1077; CT at 318.) Additionally, the jury received a number of instructions before finding the priors to be true, including that it was to determine whether the documents proffered to prove the priors were "authentic and say what they are purported to say." (RT at 1074.) And, those documents established the prior prison allegations were, in fact, true. Petitioner's extensive criminal history includes the two felonies the jury found true, robbery in 1994 and discharging a firearm in a grossly negligent manner in 1996. The record shows he served terms for both felonies, and five years did not lapse before Petitioner committed new felonies. (CT at 319-46.) And, in any event, as the state court of appeal found, Petitioner's sentence was not ultimately enhanced based on the § 667.5(b) findings. (CT at 469-70.) The omission of CALJIC No. 17.18.1 did not violate due process or have a substantial and injurious effect on the verdict. *Henderson*, 431 U.S. at 154; *Brecht*, 507 U.S. at 623.

Petitioner is not entitled to federal habeas relief in ground four.

///

///

24

**D.    Ineffective Assistance of Counsel ("IAC") Claims (Grounds Five and Six)**

Petitioner next contends his trial and appellate attorneys were constitutionally ineffective for alleged deficiencies discussed below. (TAP at 9-11; Reply at 6-7.)

**1.    Legal Standard**

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court held that a Sixth Amendment IAC claim has two components: "deficient performance" and resulting "prejudice." *Id.* at 687-694.

The deficient performance component requires the petitioner to show his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687-88. Doing so requires a petitioner to overcome the "strong presumption" his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Recognizing the temptation to fault counsel's performance after conviction or adverse sentence, *Strickland* emphatically cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential" and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

The prejudice component requires a petitioner to "affirmatively prove prejudice" by showing "that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687, 693. The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

1  sufficient to undermine confidence in the outcome." *Id.* at 694. Making this
2  determination requires the court to consider the totality of the evidence before the judge
3  or jury. *Id.* at 695. Further, since the *Strickland* prejudice analysis is complete in itself,
4  there is no need for an additional harmless-error analysis under *Brecht*. *Jackson v.*
5  *Calderon*, 211 F.3d 1148, 1154 n. 2 (9th Cir. 2000).

6      A court reviewing an IAC claim may analyze the two *Strickland* components in
7  any order; it is not necessary to address both prongs if the petitioner makes an
8  insufficient showing on either one. *Id.* at 697. *Strickland* expressly provides that "[i]f
9  it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient
10 prejudice, which we expect will often be so, that course should be followed." *Id.*

11     The Supreme Court recently underscored *Strickland's* continuing vitality as
12 clearly established federal law for IAC claims and its relationship to § 2254(d)'s
13 deferential standard of review in a pair of unanimous decisions. *See Richter*, 131 S. Ct.
14 770; *Premo v. Moore*, 562 U.S. ---, 131 S. Ct. 733 (2011).

15     In *Richter*, the Supreme Court stressed "[t]he pivotal question is whether the state
16 court's application of the *Strickland* standard was unreasonable[,]" which differs from
17 ". . . asking whether defense counsel's performance fell below *Strickland's* standard."
18 *Richter*, 131 S. Ct. at 785. *Richter* reminds lower courts that "[s]urmounting
19 *Strickland's* high bar is never an easy task[,]" and because an IAC claim "can function
20 as a way to escape rules of waiver and forfeiture and raise issues not presented at trial,
21 . . . the *Strickland* standard must be applied with scrupulous care." *Id.* In § 2254 cases,
22 *Richter* further cautions:

23          Establishing that a state court's application of *Strickland* was
24      unreasonable under § 2254(d) is all the more difficult. The standards
25      created by *Strickland* and § 2254(d) are both "highly deferential," . . . and
26      when the two apply in tandem, review is "doubly" so. The *Strickland*
27      standard is a general one, so the range of reasonable applications is
28      substantial. Federal habeas courts must guard against the danger of

equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* at 788 (citations omitted); *see also Moore*, 131 S. Ct. at 739-40.

### 2. Analysis

#### a. Trial Counsel

Petitioner accuses his trial attorney of the following errors and omissions: (1) not being a valid member of the California bar; (2) failing to investigate 25 potential prosecution witnesses; (3) failing to investigate or call seven additional defense witnesses; (4) failing to fully investigate other prosecution witnesses such as the coroner and an emergency room doctor, or call paramedics and other doctors who allegedly would testify King was actually shot in the chest; (5) failing to adequately object to the admission of autopsy photographs that were ostensibly ruled inadmissible in the first trial; and (6) failing to object to the alleged prosecutorial misconduct that is the subject of ground seven. (TAP at 10-11; Reply at 7.)

Petitioner is not entitled to federal habeas relief on his IAC claims involving his trial counsel. First, his allegation that his attorney was not a member of the California bar is unsupported by any evidence in the record. Petitioner's assertion that Respondent should furnish evidence supporting this claim (Reply at 7) fails to recognize it is *his* burden, not Respondent's, to show his counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88. It is also Petitioner's burden to show there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.* at 694. Even if Petitioner had proffered an iota of evidence to show his trial attorney was not properly licensed at any point during the representation, he has certainly not alleged or shown how that altered the ultimate result of the proceedings. As to his first allegation, Petitioner falls grossly short on both *Strickland* prongs. *Id.* at 687-88, 694.

27

Second, Petitioner's argument that his trial attorney failed to call defense witnesses is also based on bare speculation. As a rule, an IAC claim based on the failure to call a witness requires the petitioner to present evidence that the witness would have provided helpful testimony for the defense, such as an affidavit from the alleged witness. *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000). Here, Petitioner vaguely asserts that potential defense witnesses would have "contradict[ed the] prosecutor's theory and help[ed] support Petitioner's self-defense theory" (TAP at 10), but he has failed to produce a sworn statement from any witness, or even explain what relevant, material testimony these witnesses would have provided. *Dows*, 211 F.3d at 486. Petitioner has not shown his counsel failed to call any defense witness whose testimony would have altered the outcome of this case. *Strickland*, 466 U.S. at 694.

Third, Petitioner's contention that his trial attorney failed to investigate both potential and actual prosecution witnesses is yet another speculative assertion that appears to be based solely on Petitioner's frustration that the result of his trial was not in his favor. *See Strickland*, 466 U.S. at 689. Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, but not to interview every conceivable witness. *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001). To determine the reasonableness of a decision not to investigate, the court must apply a heavy measure of deference to counsel's judgments. *Franklin v. Johnson*, 290 F.3d 1223, 1234 (9th Cir. 2002); *see also Richter*, 131 S. Ct. at 785 ("the *Strickland* standard must be applied with scrupulous care."). Here, the only assertion by Petitioner that is not based on pure speculation is his complaint that his trial counsel failed to do more to rebut the prosecution's evidence that King was shot in the back. (TAP at 10; Reply at 7.) However, he again fails to show what witness or other evidence would have done that, and how. *Dows*, 211 F.3d at 486. The record establishes defense counsel made a diligent effort to challenge the prosecution's theory that King was shot from behind, including a vigorous cross-examination of the coroner and an emergency room doctor.

(RT at 325-43, 678-88.) In light of the competent, zealous defense reflected in the record, Petitioner has failed to demonstrate that his attorney's failure to investigate any lead or call any particular witness was not the result of a sound strategic decision, *see United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990), or that his attorney's efforts otherwise fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88.

Fourth, Petitioner's last two IAC allegations against his trial counsel surround counsel's alleged failure to adequately challenge prosecutorial misconduct and the erroneous admission of autopsy photographs. (TAP at 10-11, Reply at 7.) Those allegations are the subject of grounds seven and nine, below. And, as shown in detail below, both of those claims are without merit. As a result, the underlying basis of Petitioner's last two IAC allegations is also without merit. Since an attorney is not ineffective for failing to take futile actions, *see Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989) (an attorney is not ineffective for failing to raise a meritless legal argument); *see also James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (the failure to make a futile motion does not constitute ineffective assistance of counsel), and since grounds seven and nine have been denied by the state courts on state habeas review and now by this court on federal habeas review, Petitioner cannot show his counsel's alleged failures to act prejudiced him. *Strickland*, 466 U.S. at 694.

### b.    Appellate Counsel

In ground five, Petitioner claims his appellate counsel was deficient for allegedly relying on an incomplete and distorted copy of the reporter's transcript, and for failing to raise grounds six through nine of the TAP on direct appeal.[4] (TAP at 9; Reply at 6.) The standard for evaluating a claim of ineffective assistance of appellate counsel is the same as that for trial counsel -- the petitioner must show deficient performance and prejudice. *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001). Petitioner has not

---

[4]   Petitioner also claims his appellate counsel failed to raise ground five, but ground five is his current claim against appellate counsel. (Reply at 6.)

1   shown his appellate counsel was constitutionally deficient; his claims fail both
2   *Strickland* prongs.

3        First, the transcript does not contain the omissions Petitioner argues it has. He
4   refers to three allegedly missing pages and eleven other pages, but all of the pages he
5   cites are in the transcript, and none of them reveal any visible error or distortion. One
6   of the pages is blank, but it appears to have been intentionally left blank because there
7   is nothing missing from the proceedings. (TAP at 9; *see* RT at 385.) In any case, it is
8   Petitioner's burden to establish a reasonable probability that his appellate counsel's
9   alleged error in furnishing the reporter's transcript changed the outcome of his appeal,
10  and he has not alleged or shown how any missing or distorted portion of the transcript
11  crippled his appeal in any way. *Strickland*, 466 U.S. at 694; *Bailey*, 263 F.3d at 1028.

12       As to Petitioner's claim that his appellate attorney failed to raise grounds six
13  through nine of the Petition, including his assertion that his trial counsel was not
14  properly licensed to practice law, like trial counsel, appellate counsel is not ineffective
15  for failing to raise meritless claims that have no reasonable probability of success. *Shah*,
16  878 F.2d at 1162; *Miller v. Keeney*, 882 F.2d 1428, 1435 (9th Cir. 1989). As discussed
17  in detail above and below, grounds six through nine are without merit, and have been
18  denied by the state courts on state habeas review and now by this court on federal
19  habeas review. Thus, Petitioner's appellate attorney was not ineffective for failing to
20  raise them on direct appeal. *Shah*, 878 F.2d at 1162; *Miller*, 882 F.2d at 1435.

21       Petitioner has failed to establish "there was no reasonable basis for the state court
22  to deny relief" based on alleged omissions by his trial or appellate attorneys. *Richter*,
23  131 S. Ct. at 784. He is not entitled to federal habeas relief in grounds five or six.

24  **E.    Alleged Prosecutorial Misconduct/*Brady* Violation (Ground Seven)**

25       In ground seven, Petitioner claims his conviction must be reversed because the
26  prosecution failed to disclose exculpatory evidence in violation of *Brady v. Maryland*,
27  373 U.S. 83, 83 S. Ct. 1194 (1963). Specifically, Petitioner contends the prosecution
28  withheld a recording made of a phone conversation he had when he was first arrested

in Las Vegas. Alternatively, Petitioner appears to assert the prosecutor committed misconduct by falsely claiming such a recording existed as leverage to prevent him from taking the stand. Additionally, Petitioner complains the prosecutor made certain misrepresentations, discussed below, when she offered a specific autopsy photograph into evidence. (TAP at 12; Reply at 8.)

The record shows ground seven is not exhausted because Petitioner never presented it to any state court for post-conviction relief. *See Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347 (2004) (before seeking federal habeas relief, the exhaustion doctrine requires a petitioner to fairly present a claim alleging a violation of federal rights to the state courts in order to give them a fair "opportunity to pass upon and correct the alleged violations" of his rights). However, as discussed with regard to ground four, above, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2). It is appropriate to do so in those cases in which the interests of comity and federalism will be better served, *Granberry*, 481 U.S. at 134-35, and the court finds this is such a case because ground seven "does not raise even a colorable federal claim." *Cassett*, 406 F.3d at 623-24. Thus, ground seven is addressed on the merits below.

Petitioner's entire *Brady* claim is based on a single statement made by the prosecutor before trial: "There is also a recording of the defendant's phone call from when he was in custody in Las Vegas when he was captured. That will be something the People will seek to introduce if the defendant takes the stand." (RT at 4.) There was no response to the statement from the defense or the court, no further explanation, and Petitioner has not pointed to a single other instance in the record reflecting any further discussion about the alleged recording. It is unclear whether the prosecutor merely misspoke and later determined no recording existed, or whether the alleged recording simply turned out to be immaterial to the case, but it does not appear the issue was raised again by either side, and no recording was proffered or admitted at trial.

Based on the foregoing, Petitioner's *Brady* claim falls grossly short. A *Brady* violation requires three elements be met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936 (1999); *Hamilton v. Ayers*, 583 F.3d 1100, 1110 (9th Cir. 2009). To establish prejudice under *Brady*, the petitioner must show a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Hamilton*, 583 F.3d at 1110. Here, Petitioner has failed to establish the existence of all three elements of a *Brady* violation. That single statement by the prosecutor, without any objection or further discussion of whether such a recording existed, what statements it contained, or whether it was turned over to the defense, is insufficient to show the prosecution withheld any evidence, let alone evidence favorable to Petitioner, or that he was prejudiced. *See Crawford v. Head*, 311 F.3d 1288, 1329 (11th Cir. 2002) (this court "cannot consider conjecture" about what evidence "might have shown" in deciding a *Brady* claim); *Cooper v. Brown*, 510 F.3d 870, 925 (9th Cir. 2007) ("The mere possibility that undisclosed information might have helped the defense, or might have affected the outcome of the trial, is insufficient to establish materiality in the constitutional sense."). Notably, Petitioner alleges the prosecutor threatened to use the recording against him if he testified, so it does not appear that even Petitioner was ever under the impression the recording, if it existed, was *favorable* to his case. Petitioner's *Brady* claim fails. *Strickler*, 527 U.S. at 281-82, 296.

Petitioner has also failed to show the prosecutor engaged in any prosecutorial misconduct. A prosecutor has a duty to refrain from using improper methods to procure a conviction. *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991). Where a prosecutor obtains a conviction by stepping outside the rules, the conviction is subject to challenge based on prosecutorial misconduct. *United States v. Kojayan*, 8 F.3d 1315, 1323-1324 (9th Cir. 1993). To warrant habeas relief, the prosecutorial misconduct must

have been so egregious that it fatally infected the entire trial, rendering it fundamentally unfair and denying the petitioner due process. *Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). The petitioner must affirmatively prove he was actually prejudiced, *Gallego v. McDaniel*, 124 F.3d 1065, 1079 (9th Cir. 1997), and the actions of the prosecutor must be considered in the context of the entire trial. *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th Cir. 1993).

Again, Petitioner is not entitled to federal habeas relief based on that single pretrial statement made by the prosecutor on an issue that did not receive a response and never arose again. There is no record to show whether the prosecutor was speaking accurately about the existence of a recording, or was mistaken, and there is certainly no evidence of misconduct rising to the level of a due process violation. *Duckett*, 67 F.3d at 743. Moreover, the record establishes the defense's decision not to put Petitioner on the stand was influenced by his potential impeachment based on his priors. (RT at 937-40, 942-44.) There is no indication that the prosecutor's single pretrial statement about a recording had any influence whatsoever on Petitioner's decision not to testify, so he has also not affirmatively demonstrated prejudice. *Gallego*, 124 F.3d at 1079.

Finally, Petitioner claims the prosecutor committed misconduct by falsely implying to the trial judge that an autopsy photograph, specifically a photograph showing the thoracotomy (chest incision), was admitted into evidence at Petitioner's first trial when it was actually excluded. There is no merit to this claim.  Petitioner's first trial ended in a mistrial due to a hung jury (RT at A5-A10), and his conviction was secured in a second trial. The colloquy at issue from the second trial reflects the prosecutor "did not want to bring in any photographs that showed the thoracotomy," but that failing to do so in the first trial "became an issue in closing" because of a wound that was obscured. (RT at 354.) There is nothing in the record even suggesting the prosecutor's comments were false. Petitioner's argument the photograph at issue was excluded from the first trial is misplaced, since the prosecutor's comment that it "became an issue in closing" meant *not having it in evidence* became an issue for her

33

1  in proving her case.[5] Petitioner again fails to show any prosecutorial misconduct in
2  violation of his right to due process, *Duckett*, 67 F.3d at 743, and he has not
3  affirmatively demonstrated any prejudice. *Gallego*, 124 F.3d at 1079.

4      Petitioner is not entitled to habeas relief for his claims of prosecutorial
5  misconduct in ground seven.

6  **F.   *Miranda*[6] Claim (Ground Eight)**

7      Petitioner contends in ground eight that incriminatory statements he made to
8  police investigators on September 11, 2002, were obtained in violation of *Miranda*
9  because the officer who advised him of his *Miranda* rights told him his statements
10 "may" be used against him instead of "can and will" be used against him. (TAP at 13;
11 Reply at 8; *see* RT at 12-14, 431, 619.) This claim is legally frivolous.

12     Petitioner has pointed to no clearly established Supreme Court precedent
13 requiring that *Miranda* advisements use the language "can and will." As Respondent
14 correctly points out, the Supreme Court has "never insisted that *Miranda* warnings be
15 given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195,
16 202, 109 S. Ct. 2875 (1989). Morever, the *Miranda* decision itself uses the words
17 "may," "can," and "can and will" interchangeably. *Miranda*, 384 U.S. at 444, 469, 479.
18 Thus, the advisements given to Petitioner did not deviate from *Miranda* at all. (RT at
19 12.) Petitioner's additional allegation, that the interrogating officer made him a promise
20 that none of his statements would be used against him, is completely baseless. *See*

21  _____

22     [5]  Additionally, Petitioner has not shown the photograph was in fact offered and
23 excluded from the first trial. He points to a minute order from the first trial indicating
   that a hearing was held on the admissibility of "photographic exhibits." (TAP at 34-35.)
24 But, the minute order does not indicate whether Petitioner sought the admission of the
   thoracotomy photograph at issue. Further, while Petitioner claims photographs were
25 excluded at that hearing, the minute order appears to reflect otherwise because it shows
26 that *after* the admissibility hearing, several autopsy-related photographs were being
27 marked as prosecution exhibits. (TAP at 35.) In any case, it is clear there is nothing in
   the record to show the prosecutor made any false statements.

28     [6]  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

1   *Blackledge v. Allison*, 431 U.S. 63, 75, 97 S. Ct. 1621 n.7 (1977) (the petition is

2   expected to state facts that point to a real possibility of constitutional error).

3         In any event, the alleged *Miranda* error was harmless in this case. *Brecht*, 507

4   U.S. at 623, 637. First, the statements Petitioner made to the police were far more self-

5   serving and supportive of his self-defense theory than they were incriminating. (RT at

6   434-37, 618-29, 646-47.) Second, the jury was instructed that it could not find him

7   guilty unless there was proof of each element independent of his statements to the

8   police. (CT at 253.) And, third, as discussed in detail above, the eyewitness evidence

9   of Petitioner's guilt in this case was overwhelming. Habeas relief is available only if the

10  record demonstrates the jury's decision was substantially influenced by an alleged error

11  or there is "grave doubt" about whether an error was harmless. *O'Neal v. McAninch*,

12  513 U.S. 432, 434, 115 S. Ct. 992 (1995). The record establishes neither in this case in

13  light of the strong evidence of Petitioner's guilt.

14        Petitioner is not entitled to habeas relief for his *Miranda* claim in ground eight.

15  **G.   Alleged Erroneous Admission of Autopsy Photograph (Ground Nine)**

16        Petitioner claims the trial court violated his "constitutional right to a fair trial" by

17  allowing the prosecutor to introduce the thoracotomy photograph discussed above in

18  ground seven. (TAP at 14; Reply at 8.)

19        Although Petitioner couches grounds nine in constitutional language, the essence

20  of his claim is the admitted evidence created substantial danger of undue prejudice in

21  violation of California Evidence Code section 352. However, a federal court may

22  entertain an application for a writ of habeas corpus by a state prisoner "only on the

23  ground that he is in custody in violation of the Constitution or laws or treaties of the

24  United States." 28 U.S.C. § 2254(a). Consequently, a petitioner may not challenge an

25  evidentiary ruling on the ground that it violated the state's evidence code. *Jammal v.*

26  *Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). The failure to comply with a

27  state's rules of evidence is neither a necessary nor sufficient basis for granting federal

28  habeas relief. *Id*. Rather, an evidentiary ruling may be challenged only if it rendered the

trial so fundamentally unfair as to violate federal due process. *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). Petitioner's ninth claim is a non-cognizable state evidentiary claim despite his allegation to the contrary.

The improper admission of evidence can violate a defendant's right to federal due process only where there are no permissible inferences the jury may draw from the contested evidence. *Id*. However, when the disputed evidence creates an inference that is relevant to some fact of consequence, its admission does not give rise to a Constitutional violation. *Id*. at 1104. The petitioner bears the burden of overcoming the presumption that the evidentiary ruling was correct and not violative of due process. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996). As the trial court found, it was the defense that put this particular photograph into issue by challenging the coroner on cross-examination for failing to have photographs taken of King's chest. (RT at 334-35, 354-56.) Thus, the challenged photograph was clearly relevant to a fact of consequence, and its admission into evidence did not violate due process. *Windham*, 163 F.3d at 1104.

Regardless, even if the challenged photograph had been allowed in error, Petitioner cannot show the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. The trial court found the photograph was not "unduly gruesome" and that the prosecutor had redacted the more sensitive areas of the photograph, such as King's face and genitals. (RT at 354-56.) Additionally, the jurors were instructed to decide the case based solely on the facts and the law, and not to "be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." (CT at 102-03.) In light of those safeguards, the overwhelming eyewitness evidence of Petitioner's guilt rendered any error in admitting one additional photograph harmless. *Brecht*, 507 U.S. at 637.

Ground nine does not entitle Petitioner to federal habeas relief.

### III. RECOMMENDATION

For the reasons reported above, IT IS RECOMMENDED that the court issue an

order: (1) approving and adopting this Report and Recommendation; and (2) directing

that judgment be entered dismissing this action with prejudice.


Dated: March 1, 2011

_____

ARTHUR NAKAZATO
UNITED STATES MAGISTRATE JUDGE